1  **SCOTT C. CLARKSON, ESQ.** SBN 143271
   **EVE A. MARSELLA, ESQ.** SBN 165797
2  **CHRISTINE M. FITZGERALD, ESQ.** SBN 259014
   **CLARKSON, GORE & MARSELLA**
3  **A PROFESSIONAL LAW CORPORATION**
4  **3424 Carson Street, Suite 350**
   **Torrance, California 90503**
5  **(310) 542-0111 Telephone**
   **(310) 214-7254 Facsimile**
6
7  Attorneys for 374 West 8th Street, LLC, Debtor and
   Debtor in Possession
8
9                **UNITED STATES BANKRUPTCY COURT**
10               **CENTRAL DISTRICT OF CALIFORNIA,**
11                    **LOS ANGELES DIVISION**
12  In Re                              Case No.  2:10-bk-19554-ER
13  374 West 8th Street, LLC,          Chapter 11
14          Debtor and Debtor in       **DEBTOR'S SUPPLEMENTAL OPPOSITION**
            Possession.                **TO MOTION FOR (A) RELIEF FROM THE**
15                                     **AUTOMATIC STAY UNDER 11 U.S.C. § 362**
                                       **(REAL PROPERTY), AND (B) RELIEF**
16                                     **FROM TURNOVER UNDER 11 U.S.C. § 543**
17                                     **BY PREPETITION CUSTODIAN OR OTHER**
                                       **CUSTODIAN BY HALEH TURKAMAN;**
18                                     **AND DECLARATIONS OF TONY ASHAI,**
                                       **ROBERT JEFFRIES, AND JAMES P. COLE**
19                                     **IN SUPPORT THEREOF**
20
21                                     DATE:     June 22, 2010
                                       TIME:     10:00 a.m.
22                                     PLACE:    Courtroom 1568,
                                                 255 East Temple Street
23                                                 Los Angeles, CA
24
25
26
27
28

1  Supplemental Opposition to Motion for Relief from Stay

# TABLE OF CONTENTS

**PAGE(S)**

INTRODUCTION ............................................................................................. 2

BACKGROUND .............................................................................................. 4

    A.    Disclosure Statement and Plan.................................................................. 7

    B.    The Debtor's Proposed Secured Financing with Ashai
           Construction and a Backup Lender .................................................. 7

LEGAL ANALYSIS........................................................................................ 8

    A.    THE COURT SHOULD NOT GRANT RELIEF FROM THE
           STAY PURSUANT TO SECTION 362(d)(1) BECAUSE THE
           MOVANT IS ADEQUATELY PROTECTED. ............................. 8

    B.    THE COURT SHOULD NOT GRANT RELIEF FROM THE
           STAY BECAUSE THE PROPERTY IS NECESSARY TO AN
           EFFECTIVE REORGANIZATION. ................................................ 10

    C.    THE COURT SHOULD EXERCISE ITS AUTHORITY UNDER
           SECTION 105(a) OF THE BANKRUPTCY CODE TO
           ENFORCE THE AUTOMATIC STAY. ......................................... 12

CONCLUSION................................................................................................ 13

DECLARATION OF TONY ASHAI........................................................... 14

DECLARATION OF ROBERT JEFFRIES ................................................ 18

DECLARATION OF JAMES P. COLE....................................................... 19

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992)............................ 9

*In re Clark*, 409 B.R. 906, 912 (Bankr. E.D. Ark. 2009) ........................................................... 12

*In re Ledgemere Land Corp.*, 125 B.R. 58, 60-61 (Bankr. D. Mass. 1991) .......................... 9, 10

*In re Medical Plaza Associates, Ltd.*, 67 B.R. 879, 882 (W.D. Mo. 1986) ................................ 12

*In re Pac. Lifestyle Homes, Inc.*, 2009 Bankr. LEXIS 711, 32-33 (Bankr. W.D.
   Wash. 2009) ............................................................................................................................ 10

*In re Rolanco, Inc.*, 43 B.R. 150, 151-52 (Bankr. E.D. Mo. 1984) ........................................... 12

*Resolution Trust Corp. v. Swedeland Dev. Group (In re Swedeland Dev. Group)*,
   16 F.3d 552, 564 (3d Cir. N.J. 1994) ....................................................................................... 9

*Resolution Trust Corp. v. Swedeland Dev. Group (In re Swedeland Dev. Group)*,
   16 F.3d 552, 567 (3d Cir. N.J. 1994) ..................................................................................... 10

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S.
   365, 375-76 (1988)................................................................................................................... 11

*United Sav. Asso v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 382 (U.S.
   1988) .......................................................................................................................................... 9

*United Savings Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S.
   365, 98 L. Ed. 2d 598, 108 S. Ct. 626 (1988) .......................................................................... 9

## STATUTES

11 U.S.C. § 361 ............................................................................................................................. 9

11 USC § 362 (d)(1) ...................................................................................................................... 8

11 U.S.C. § 362 (d)(2) ................................................................................................................. 11

## OTHER AUTHORITIES

1978 U.S. Code Cong. & Admin. News 5787, 6296 ...................................................................... 9

1     **TO THE HONORABLE ERNEST ROBLES, UNITED STATES BANKRUPTCY**

2 **JUDGE, THE UNITED STATES TRUSTEE, AND ALL PARTIES IN INTEREST:**

3     374 West 8th Street, LLC, the debtor and debtor in possession in the above entitled

4 Chapter 11 proceeding (the "Debtor"), hereby files this *Debtor's Supplemental Opposition To*

5 *Motion For (A) Relief From The Automatic Stay Under 11 U.S.C. § 362 (Real Property), And (B)*

6 *Relief From Turnover Under 11 U.S.C. § 543 By Prepetition Custodian Or Other Custodian By*

7 *Haleh Turkaman* ("Opposition").[1]  The Debtor respectfully represents as follows:

8 **I.**

9 **<u>INTRODUCTION</u>**

10     The Debtor opposes the relief requested in the *Motion For (A) Relief From The*

11 *Automatic Stay Under 11 U.S.C. § 362 (Real Property), And (B) Relief From Turnover Under*

12 *11 U.S.C. § 543 By Prepetition Custodian Or Other Custodian By Haleh Turkaman* [Docket

13 No. 9] (the "Motion") because (1) the Debtor will provide adequate protection by finishing the

14 construction of, and selling, 18 condominiums on the Property,[2] which will increase the value

15 of the Property significantly more than the cost of construction, (2) the Debtor has a reasonable

16 possibility of a successful reorganization within a reasonable time, and (3) the Court should

17 exercise its authority under Section 105(a) of the Bankruptcy Code and consider the equities of

18 the situation because the Current Lender's own actions and failures to act have resulted in

19 severe damage to the Property, which in turn have increased the challenges to the Debtor's

20 ability to reorganize.

21     Since the previous hearing on the Motion, the Debtor discovered that, while the Receiver

22 was responsible for the Property, the Receiver and the Current Lender (and possibly others)

23

24 [1]    A reply to an opposition must be filed with the Court and served on the Debtor not later than

25 7 days prior to the hearing on the related motion pursuant to Local Bankruptcy Rule 9013-1(f).

26 [2]    Capitalized terms that are not defined herein are defined in the *Debtor's Opposition To*

27 *Motion For (A) Relief From The Automatic Stay Under 11 U.S.C. § 362 (Real Property), And (B) Relief From Turnover Under 11 U.S.C. § 543 By Prepetition Custodian Or Other*

28 *Custodian By Haleh Turkaman*  [Docket No. 31] (the "Original Opposition").

1   improperly allowed the Property to sustain significant damages.  The Debtor, Tony Ashai,

2   Athar Ashai and Emil Youssefzadeh (the "Plaintiffs") have filed or soon will file a complaint

3   for an adversary proceeding against the Receiver, the Current Lender, and third party Karman

4   Ghadimi (who is the husband of the Current Lender) (the "Defendants").  A copy of the

5   Complaint is attached hereto as Exhibit "1."  The claims for relief asserted in the complaint

6   include: (1) claims for determination of validity, priority and extent of lien against the Current

7   Lender, and disallowance and equitable subordination of claims of the Current Lender and the

8   Receiver; (2) claims against the Receiver for negligence, breach of fiduciary duty, and recovery

9   of bonds based upon the significant damage done to the Property while in the Receiver's care;

10   and (3) claims against the Current Lender and Ghadimi for fraud, breach of contract, aiding and

11   abetting breach of fiduciary duty, and civil conspiracy based upon representations made by

12   Ghadimi, the breach by Defendants of agreements between Ghadimi and the Debtor, and

13   conspiracy between Ghadimi and the Current Lender, all regarding the Property and the

14   Plaintiffs' obligations under the Promissory Note.  The complaint seeks general, special,

15   exemplary, and punitive damages, as well as recovery of certain bond amounts, valuation of the

16   Current Lender's secured claim (if any), and disallowance and equitable subordination of

17   claims.

18        To carry out the construction and sale of the condominiums, the Debtor's plan is to

19   recover (among other things) the amount necessary to fix the Property Damages and to obtain

20   approval of the financing (which is to be a "priming" loan), which it has obtained from Ashai

21   Construction in the amount of $1,500,000.  The Debtor has also sought a commitment from

22   another lender to provide this priming loan if Ashai Construction cannot fund it from its cash

23   flow, but has not received a commitment.  With funds from the Lawsuit and the financing, the

24   Debtor will finish construction the condominiums, which will increase the equity available to

25   creditors by in excess of $5,746,900, which is significantly more than the cost of construction.

26        The Debtor will soon file: (1) a complaint to commence an adversary proceeding seeking

27   damages from the secured lender, Haleh Turkaman (the "Current Lender") and the Receiver for

28

1    their failure to protect the Property while it was the responsibility of the Receiver and their

2    failure to take the other actions required by the Receiver Order (see Exhibit "1"), (2) a motion

3    to approve the priming loan, and (3) its disclosure statement and plan of reorganization.

4         As discussed in detail below, the stay should not be lifted because the Current Lender is

5    adequately protected, the Debtor's plan has a reasonable possibility of a successful

6    reorganization within a reasonable time, and considering the equities resulting from the Current

7    Lender being responsible for the Property Damages, the Court should exercise its authority to

8    continue the automatic stay.

9                                            **II.**

10                                    **BACKGROUND**

11        The background of this case through April 14, 2010 is described in the *Debtor's*

12   *Opposition To Motion For (A) Relief From The Automatic Stay Under 11 U.S.C. § 362 (Real*

13   *Property), And (B) Relief From Turnover Under 11 U.S.C. § 543 By Prepetition Custodian Or*

14   *Other Custodian By Haleh Turkaman* [Docket No. 31] (the "Original Opposition").  That

15   discussion is incorporated by this reference.  Capitalized terms that are not defined herein are

16   defined in the Original Opposition.

17        The Original Opposition was filed in response to the Motion [Docket No. 9].  The Debtor

18   opposed the Motion because, among other things, the Receiver had not carried out (and was

19   unlikely to carry out) its duties to protect and develop the Property, and the Property is

20    necessary for the Debtor's reorganization.

21        In the *Order Denying Motion For Relief From Turnover Under 11 U.S.C. § 543 By*

22   *Prepetition Custodian Or Other Custodian And Continuing Motion For Relief From The*

23   *Automatic Stay Under 11 U.S.C. § 362 (Real Property) By Haleh Turkaman* [Docket No. 39]

24   ("MRAS Order"), which the Court entered on April 27, 2010, the Court indicated that the

25   Motion essentially consisted of two motions: the Motion For Relief From Turnover Under 11

26   U.S.C. § 543 By Prepetition Custodian Or Other Custodian (the "Motion to Excuse Turnover")

27   and For Relief From The Automatic Stay Under 11 U.S.C. § 362 (Real Property) (the "Relief

28

1  from Stay Motion"). *See* MRAS Order at p. 2. In the MRAS Order, the Court denied the

2  Motion to Excuse Turnover and continued the hearing on the Relief from Stay Motion to June

3  22, 2010. *Id.* After entry of the Order on April 27, 2010, the Receiver turned over the Property

4  to the Debtor.

5      Because the Debtor and the other Plaintiffs[3] had been restrained from taking any actions

6  with respect to the Property from the date of the Receiver Order through the date of turn over,

7  this was the first opportunity for the Debtor to assess the current state of the Property. The

8  Debtor found that the Property appears to have sustained significant damages from the weather

9  and other causes since the appointment of the Receiver in March 2009, and the Property

10  Damages will require significant expenditures before the Debtor can finish the construction, as

11  originally estimated in the *Debtor's Opposition To Motion For (A) Relief From The Automatic*

12  *Stay Under 11 U.S.C. § 362 (Real Property), And (B) Relief From Turnover Under 11 U.S.C. §*

13  *543 By Prepetition Custodian Or Other Custodian By Haleh Turkaman* [Docket No. 31] (the

14  "Original Opposition").

15      As explained in the Original Opposition, the Debtor (at that time) estimated that the

16  Property was worth approximately $2,400,000 and needed approximately $1,500,000 in

17  construction costs to finish the condominiums. However, those amounts assumed that the

18  Property was in the same condition as when the Receiver was appointed. It is not. When the

19  Receiver was appointed receiver, construction on the Property was incomplete and the structure

20  had no roof covering and no windows or doors, leaving the existing construction exposed to the

21  outdoor elements. The Receiver did nothing to protect the Property. The basement and

22  substructure were under water for an extended period. Due to the lack of protection, rain water

23  was able to penetrate and enter the structure, causing damage to the framing and jeopardizing

24  the stability of the existing framing and foundation (the "Property Damages").

25

26

27  [3] The Debtor, Tony Ashai and Athar Ashai and Emil Youssefzadeh executed the original
    promissory note to Vineyard that was secured by the Property, so those individuals have

28  claims against the Debtor.

1   Because the Receiver and the Current Lender (and her predecessors in interest) were

2   responsible for the Property since the appointment of the Receiver and this damage occurred

3   during that time, the Plaintiffs are filing a complaint against the Defendants to seek, among

4   other things, recovery of all costs of fixing the damages for which they are responsible,

5   valuation of the Property to determine the secured and unsecured portions of the Current

6   Lender's claim asserted against the Debtor (the "Turkaman Claims") and disallowance and

7   equitable subordination of the Turkaman Claims and any claim of the Receiver to the claims of

8   mechanics lien holders and other unsecured creditors (the "Lawsuit").  A true and correct copy

9   of the Complaint is attached hereto as Exhibit "1."

10   Prior to its discovery of the Property Damages, the Debtor estimated in its Schedules that

11   the Property – without those damages – had a value of $2,400,000.  However, after turn over of

12   the Property to the Debtor, the Debtor obtained appraisals ("Appraisals") of the various types of

13   condominiums that are being built on the Property (1) in their current "as is" condition,

14   assuming no Property Damages need to be remedied, and (2) in their finished condition as

15   Condominiums that are ready for sale both now and in 12 months.  True and correct copies of

16   these appraisals are attached hereto as Exhibit "2."  The appraised value of the Condominiums

17   in their "as is" condition – without considering the costs of remediation of the Property

18   Damages – is $3,735,000, which equals the appraised values of the individual Condominiums

19   multiplied by the number of each type of Condominium on the Property.  *See* Exhibit "3," which

20   summarizes this calculation.

21   From its initial review of the Property, the Debtor estimates that the Property Damages

22   will require in excess of $1,300,000[4] to remediate.  *See* Declaration of James P. Cole ("Cole

23   Declaration") at ¶ 9.  Accordingly, the Debtor estimates the Property's fair market value (the

24   "Current FMV") is less than $2,435,000.  The Property, though, is not declining in value

25   because the remaining construction that is not affected by the Property Damages will not incur

26

27

28   [4]  As an initial step, an expert was hired on behalf of the Debtor to determine the best course
for dealing with the Property Damages.

1   damages, which will decrease the Property's value. *See* Cole Declaration at ¶ 10 and

2   Declaration of Robert Jeffries ("Jeffries Declaration") at ¶ 3. Further, after the Debtor tears

3   down the parts of the structure that need to be replaced, the value of the Property will be

4   increased by at least the cost of that demolition and clean up, because any buyer would have to

5   remove those items, and removal by the Debtor will save a buyer from having to do so.

6       From the Appraisals, the appraised value of the Condominiums in their "finished"

7   condition would be $7,470,000 if they were completed now and $8,181,900 if they are

8   completed in twelve months (because market values are rising). *See* Exhibit "3," which also

9   summarizes these calculations based on the appraised values of individual units multiplied by

10   the number of those units. Thus, completion of the condominiums using the funds necessary to

11   fix the Property Damages along with approximately $1,500,000 from the proposed financing

12   will increase the equity available to creditors by in excess of $5,746,900, which is significantly

13   more than the cost of construction.

14       **A.**     **Disclosure Statement and Plan**

15       The Debtor will soon file its *Disclosure Statement And Plan Of Reorganization For 374*

16   *West 8th Street, LLC* (the "Plan"). Basically, the Plan provides for the Debtor to recover the

17   amount necessary to remedy the Property Damages in the Lawsuit, and to use the remainder of

18   the financing to finish construction of the condominiums. This will increase the amount of

19   equity available for creditors by in excess of $5,746,900. This increase in value is the difference

20   between the Current FMV and the Debtor's estimated fair market value of approximately

21   $8,181,900 for the Property with the finished condominiums in twelve months.

22       With the proceeds from sales of the finished condominiums, the Debtor will be able to

23   repay the Current Lender and its other creditors in full.

24       **B.**     **The Debtor's Proposed Secured Financing**

25       The Plan, among other things, contemplates that the Debtor will obtain new secured

26   financing of up to $1.5 million, which will be a priming loan. The Debtor sought financing

27   from multiple sources and determined that Ashai Construction, which is the managing member

28

1   of the Debtor, will be able to finance this amount from its cash flow on other projects, and

2   Ashai Construction is willing to do so on better terms than any other potential lender.  In

3   addition, in case Ashai Construction cannot fund such $1,500,000 in the timeframes necessary

4   to complete the construction contemplated by the Plan, the Debtor has also sought a

5   commitment from another lender to provide this priming loan if Ashai Construction cannot

6   fund it from its cash flow, but has not received a commitment.  The Debtor believes that the

7   Ashai Priming Loan represents the best available financing option for the Debtor.

8        With the damages from the Lawsuit for fixing the Property Damages and the financing,

9   the Debtor will be able to drastically increase the amount of equity available for creditors, so

10   that all creditors will be paid under the plan.

11                         **III.**

12                **LEGAL ANALYSIS**

13   **A.**     **THE COURT SHOULD NOT GRANT RELIEF FROM THE STAY**

14         **PURSUANT TO SECTION 362(d)(1) BECAUSE THE MOVANT IS**

15         **ADEQUATELY PROTECTED.**

16        Section 362(d)(1) of the Bankruptcy Code provides, in relevant part, that the automatic

17   stay can be lifted for "cause," including lack of adequate protection:

18         (d) On request of a party in interest and after notice and a hearing, the
    court shall grant relief from the stay provided under subsection (a) of this section,
19     such as by terminating, annulling, modifying, or conditioning such stay--
        (1) for cause, including the lack of adequate protection of an interest in
20     property of such party in interest . . . .

21

22   11 USC § 362 (d)(1).  The Movant argues that there is no adequate protection because there is

23   no equity cushion, Motion at p. 3, and the "fair market value of the Property is declining based

24   on/due to: Current Real Estate Market in California."  Declaration of Haleh Turkaman at p. 3.

25        However, the Property's value currently is not declining because the remaining portions

26   that are not affected by the Property Damages will not be damaged further.  In addition, after the

27   Debtor tears down the parts of the structure that need to be replaced, the value of the Property

28

1  will be increased by at least the cost of that demolition and clean up because any buyer would

2  have to remove those items, and removal by the Debtor will save a buyer from having to do so.

3      The fact that a lender "is undersecured does not mean it lacks adequate protection of its

4  mortgage interest. *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd.*, 484

5  U.S. 365, 98 L. Ed. 2d 598, 108 S. Ct. 626 (1988)." *In re Ledgemere Land Corp.*, 125 B.R. 58,

6  60-61 (Bankr. D. Mass. 1991). The "determination of whether there is adequate protection is

7  made on a case by case basis." *Resolution Trust Corp. v. Swedeland Dev. Group (In re*

8  *Swedeland Dev. Group)*, 16 F.3d 552, 564 (3d Cir. N.J. 1994).

9      It is clear that the Movant, as an undersecured creditor, "is not entitled to interest on [the

10  Movant's] collateral during the stay to assure adequate protection under 11 U. S. C. §

11  362(d)(1)." *United Sav. Asso v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 382 (U.S.

12  1988). Bankruptcy Code Section 361 states that adequate protection may be provided to an

13  entity by:

14      (1) requiring the [debtor] to make a cash payment or periodic cash payments to such
15      entity, to the extent that the stay under section 362 of this title . . . results in a decrease in
        the value of such entity's interest in such property;
16      (2) providing to such entity an additional or replacement lien to the extent that such
        stay . . . results in a decrease in the value of such entity's interest in such property; or
17      (3) granting such other relief . . . as will result in the realization by such entity of the
        indubitable equivalent of such entity's interest in such property.
18
19  11 U.S.C. § 361.

20      Thus, Section 361 "confers upon 'the parties and the courts flexibility by allowing such

21  other relief as will result in the realization by the protected entity of the value of its [interest] in

22  the property involved.' House Report No. 95-595, 95th Cong., 1st Sess. (1978), reprinted in

23  1978 U.S. Code Cong. & Admin. News 5787, 6296. The goal of adequate protection is to

24  safeguard the secured creditor from diminution in the value of its interest." *In re 495 Cent. Park

25  Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992).

26      Improvements to a property from construction constitute "adequate protection" when the

27  improvements will increase the value of the property by more than the cost of the improvements.

28  *See, e.g.*, *In re 495 Central Park Avenue Corp.*, 136 Bankr. 626, 630 (Bankr. S.D.N.Y. 1992)

1  (Planned improvements constituted adequate protection where annual rental income of $180,000

2  from an existing lease conditioned on improvements would increase the value of real estate

3  securing prepetition loan by at least $800,000, and the cost for the projected improvements was

4  only $650,000).

5      Here, the Debtor's plan is to obtain construction financing (which it has done) and, if the

6  Debtor is awarded sufficient funds in the Lawsuit, to use such funds and the financing complete

7  construction of 18 condominiums, which will be sold.  The improvements will increase the

8  value of the Property over and above the cost of construction ($1,500,000) by in excess of

9  $5,746,900, so this is adequate protection for the Current Lender.  *See In re Ledgemere Land*

10  *Corp.*, 125 B.R. 58, 60-61 (Bankr. D. Mass. 1991) ("This [construction] project demands

11  completion now. The planned construction will increase the property's value by about twice the

12  $ 3 million construction cost. This alone provides the Bank with adequate protection for the $ 3

13  million priming mortgage of Haymarket Bank."); *see also Resolution Trust Corp. v. Swedeland*

14  *Dev. Group (In re Swedeland Dev. Group)*, 16 F.3d 552, 567 (3d Cir. N.J. 1994); *In re Pac.*

15  *Lifestyle Homes, Inc.*, 2009 Bankr. LEXIS 711, 32-33 (Bankr. W.D. Wash. 2009).

16      The value of the Property is not declining, and the Debtor has obtained financing for the

17  proposed construction pursuant to the Ashai Priming Loan, which will become the senior

18  secured loan(s) on the Property if the Priming Motion is granted.  These funds, together with the

19  funds needed to remedy the Property Damages that the Debtor expects to receive in the

20  Adversary Proceeding, will increase the Current FMV by in excess of $5,746,900.  As a result,

21  the Current Lender is adequately protected, so the Motion on this ground should be denied.

22  **B.    THE COURT SHOULD NOT GRANT RELIEF FROM THE STAY**

23  **BECAUSE THE PROPERTY IS NECESSARY TO AN EFFECTIVE**

24  **REORGANIZATION.**

25      The Movant also seeks relief from the stay pursuant to Section 362(d)(2) of the

26  Bankruptcy Code, which provides in relevant part:

27      (d) On request of a party in interest and after notice and a hearing, the
28      court shall grant relief from the stay provided under subsection (a) of this section .

10  Supplemental Opposition to Motion for Relief from Stay

. . --

. . . (2) [W]ith respect to a stay of an act against property under subsection (a) of this section, if-

(A) the debtor does not have an equity in such property; and
(B) such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d)(2). The Movant cannot obtain relief from the automatic stay pursuant to Section 362(d)(2) because, although the Debtor has no equity in the Property, the Property is clearly "necessary to an effective reorganization." To establish that the Property is "necessary to an effective reorganization," the Debtor only needs to show that "the property is essential for an effective reorganization *that is in prospect*. This means . . . that there must be a reasonable possibility of a successful reorganization within a reasonable time.'" *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375-76 (1988) (*emphasis in original*).

In this case, the Property is the only significant property of the Debtor, so it is essential for the Debtor's reorganization. The Debtor's plan of reorganization, described above, shows that this is an effective reorganization because the funds required to remediate the Property Damages from the Receiver and/or the Current Lender and the financing from Ashai Construction will infuse the necessary cash into the business to finish construction and result in sales that will pay off its debts secured by the Property as well as all other claims. The Debtor's actions verify reorganization is in prospect because the Debtor has filed or soon will file the Lawsuit, the Debtor has obtained the required financing from Ashai Construction to carry out the plan, and a motion approving such financing will soon be filed. The Debtor has also demonstrated that the Plan will result in completion of the construction and sale of the condominiums, and those sales will generate sufficient proceeds to pay off all claims in a reasonable time, considering the circumstances. Accordingly, the Property is essential for an effective reorganization that is in prospect, and the Motion to lift the stay on this ground should be denied as well.

**C.    THE COURT SHOULD EXERCISE ITS AUTHORITY UNDER SECTION 105(a) OF THE BANKRUPTCY CODE TO ENFORCE THE AUTOMATIC STAY.**

"Historically, it is well established and long recognized that bankruptcy proceedings are equitable in nature." *In re Rolanco, Inc.*, 43 B.R. 150 (Bankr. E.D. Mo. 1984). The Bankruptcy Court may "review the circumstances of the case before it and determine that the stay may be continued in order to protect the debtor's property." *In re Medical Plaza Associates, Ltd.*, 67 B.R. 879, 882 (W.D. Mo. 1986); *see In re Clark*, 409 B.R. 906, 912 (Bankr. E.D. Ark. 2009) ("The Court finds it to be manifestly unjust to the Debtor to allow one court to take her wages to pay the secured debt on her home, while another court is evicting her from that same home as a tenant behind in rent payments."). In addition:

> A number of courts have held that independently of section 362 the Bankruptcy Court, pursuant to 11 U.S.C. § 105 of the Bankruptcy Code and its inherent equitable powers, may enjoin secured creditors from pursuing their rights to collateral until the bankruptcy proceeding is resolved.

*In re Rolanco, Inc.*, 43 B.R. 150, 151-52 (Bankr. E.D. Mo. 1984). The question is whether irreparable harm would occur "if the movant were permitted to foreclose its deed of trust on the subject property." *Id.* at 153. In *Rolanco*, the court found that irreparable harm would occur and the "loss of this farm would greatly reduce debtor's chances of reorganizing and may ultimately injure the rights of the involved unsecured creditors." *Id.*

Here, to the extent that the Debtor's successful reorganization is less certain because of the Property Damages, it is only less certain because the Current Lender and the Receiver, who effectively was acting on her behalf, caused – or at least improperly allowed – the Property Damages. It would be inequitable for the Court to lift the stay and allow the Current Lender to foreclose because the Current Lender greatly contributed to the Property Damages. Further, the Debtor's estate would suffer irreparable harm because it would not be able to finish the construction of the condominiums, whose sale would likely result in full payment of all claims. Instead, if the Property is foreclosed upon by the Current Lender, who allowed the Property

1  Damages, all other creditors would receive nothing.  The Court should use its authority under

2  Section 105(a) to avoid such an inequitable result.

### IX.

### CONCLUSION

5      For the reasons set forth herein, the Debtor requests that the Court deny the relief

6  requested in the Motion.

7

Dated: June 8, 2010           CLARKSON, GORE & MARSELLA, APLC

8

9          By _____

             Scott C. Clarkson
10               Eve A. Marsella

11               Christine M. Fitzgerald
             Attorneys for 374 West 8th Street, LLC, Debtor and Debtor
12               in Possession

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF TONY ASHAI**

I, TONY ASHAI, f/k/a Aziz Ashai, declare as follows:

1.    I am the President of Ashai Construction and Design, Inc., which is the Managing Member of 374 W. 8th Street, LLC (the "Debtor"). I have direct supervisory responsibilities over the financial affairs and operations of the Debtor. I have reviewed the appropriate books and records of the Debtor which are maintained and obtained in the ordinary course of business, and have personal knowledge of the matters set forth herein because of that review or because of direct personal knowledge. If called upon as a witness in this case, I would and could testify competently thereto.

2.    The Original Opposition[5] was filed in response to the Current Lender's *Motion For Relief From Turnover Under 11 U.S.C. § 543 By Prepetition Custodian Or Other Custodian* (the "Motion to Excuse Turnover") *and For Relief From The Automatic Stay Under 11 U.S.C. § 362 (Real Property)* [Docket No. 9] (the "Motion"). The Debtor opposed those motions because, among other things, the Receiver had not carried out (and was unlikely to carry out) its duties to protect and develop the Property, and the Property is necessary for the Debtor's reorganization.

3.    Because the Debtor and its principals had been restrained from taking any actions with respect to the Property from the date of the Receiver Order through the date of turn over, the first opportunity for the Debtor to assess the current state of the Property occurred after the Receiver turned over the Property to the Debtor. The Debtor found that the Property appears to have sustained significant damages from the weather and other causes (the "Property Damages") since the appointment of the Receiver in March 2009, and the Property Damages will require significant expenditures before the Debtor can finish the construction, as originally estimated in the Original Opposition.

4.    The Debtor (at the time of the Original Opposition) estimated that the Property was worth approximately $2,400,000 and needed approximately $1,500,000 in construction costs to finish the condominiums. However, those amounts assumed that the Property was in the same

---

[5]    Capitalized terms are defined in the Motion.

14    Supplemental Opposition to Motion for Relief from Stay

1  condition as when the Receiver was appointed.  It is not.  An expert has been retained to assess

2  the extent of the Property Damages to determine how to formulate an effective plan of

3  reorganization.

4        5.      Because the Receiver and the Current Lender (and her predecessors in interest)

5  were responsible for the Property since the appointment of the Receiver and this damage

6  occurred during that time, the Debtor is filing a complaint against the Current Lender, the

7  Receiver and a third party, Kamran Ghadimi, to seek, among other things, recovery of all costs

8  of fixing the damages for which they are responsible, valuation of the Property to determine the

9  secured and unsecured portions of the Current Lender's claim asserted against the Debtor (the

10  "Turkaman Claims") and equitable subordination of the Turkaman Claims to the claims of

11  mechanics lien holders and other unsecured creditors (the "Lawsuit").  A true and correct copy of

12  the Complaint is attached hereto as Exhibit "1."

13        6.      After turn over of the Property to the Debtor, the Debtor obtained appraisals

14  ("Appraisals") of the various types of condominiums that are being built on the Property (1) in

15  their current "as is" condition, assuming no Property Damages need to be remedied, and (2) in

16  their finished condition as Condominiums that are ready for sale.  True and correct copies of

17  these appraisals are attached hereto as Exhibit "2."  The appraised value of the Condominiums in

18  their "as is" condition – without considering the costs of remediation of the Property Damages –

19  is $3,735,000, which equals the appraised values of the individual Condominiums multiplied by

20  the number of each type of Condominium on the Property.  Exhibit "3" to the Motion

21  summarizes this calculation.

22        7.      From its initial review of the Property, the Debtor estimates that the Property

23  Damages will require in excess of $1,300,000 to remediate.  Accordingly, the Debtor estimates

24  the Property's fair market value (the "Current FMV") is less than $2,435,000.

25        8.      Further, after the Debtor tears down the parts of the structure that need to be

26  replaced, the value of the Property will be increased by at least the cost of that demolition and

27

28

1  clean up, because any buyer would have to remove those items, and removal by the Debtor will

2  save a buyer from having to do so.

3        9.     From the Appraisals, the appraised value of the Condominiums in their "finished"

4  condition would be $7,470,000 if they were completed now and $8,181,900 if they are

5  completed in twelve months (because market values are rising). *See* Exhibit "3," which also

6  summarizes these calculations based on the appraised values of individual units multiplied by the

7  number of those units. Thus, completion of the condominiums using the funds necessary to fix

8  the Property Damages along with approximately $1,500,000 from the proposed financing will

9  increase the equity available to creditors by in excess of $5,746,900, which is significantly more

10  than the cost of construction.

11        10.    The Debtor will soon file its *Disclosure Statement and Plan Of Reorganization*

12  *for 374 West 8th Street, LLC* (the "Plan"). The Plan provides for the Debtor to recover the

13  amount necessary to remedy the Property Damages in the Lawsuit, and to use the remainder of

14  the financing to finish construction of the condominiums. This will increase the amount of

15  equity available for creditors by in excess of $5,746,900. This increase in value is the difference

16  between the Current FMV and the Debtor's estimated fair market value of approximately

17  $8,181,900 for the Property with the finished condominiums in twelve months.

18        11.    With the proceeds from sales of the finished condominiums, the Debtor will be

19  able to repay the Current Lender and its other creditors in full. Those creditors include myself

20  and Athar Ashai (who are two of the Debtor's principals). Athar Ashai, Emil Youssefzadeh and

21  I (together, the "Co-Borrowers") along with the Debtors signed the Note") to Vineyard that was

22  secured by the Property. If the Current Lender is not fully repaid the amount owed pursuant to

23  the Vineyard Note and if the Borrowers pay any such unpaid amounts, then the Co-Borrowers

24  will have claims against the Debtor for any such payments.

25        12.    The Plan, among other things, contemplates that the Debtor will obtain new

26  secured financing of up to $1.5 million, which will be a priming loan. The Debtor sought

27  financing from multiple sources and determined that Ashai Construction, which is the managing

28

1  member of the Debtor, will be able to finance this amount from its cash flow on other projects,

2  and Ashai Construction is willing to do so on better terms than any other potential lender.  In

3  addition, in case Ashai Construction cannot fund such $1,500,000 in the timeframes necessary to

4  complete the construction contemplated by the Plan, the Debtor has also sought a commitment

5  from another lender to provide this priming loan if Ashai Construction cannot fund it from its

6  cash flow, but has not received a commitment.  The Debtor believes that the Ashai Priming Loan

7  represent the best available financing option for the Debtor.  A motion approving such financing

8  will soon be filed.

9      13.    With the damages from the Lawsuit for fixing the Property Damages and the

10  financing, the Debtor will be able to drastically increase the amount of equity available for

11  creditors, so that all creditors will be paid in full under the plan.

12      14.    The Debtor has also demonstrated that sales of the condominiums will generate

13  sufficient proceeds to pay all claims in a reasonable time, considering the circumstances.

14      I declare under penalty of perjury under the laws of the State of California that the above

15  is true and correct and that this Declaration was executed on June 8th, 2009 at

16  Torrance        , California.

17                TONY ASHAI

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF ROBERT JEFFRIES

I, ROBERT JEFFRIES, declare as follows:

1.     I am a licensed Real Estate Appraiser, Office of Real Estate Appraisers Identification Number AL037183, and I work as an appraiser with Accupraisal Management Corporation, 831 Roses Road, San Gabriel, CA 91775-2123. I received my OREA license on 5/4/2005

2.     I prepared the appraisals, which are attached to the Motion as Exhibit "2." I have reviewed the appropriate books and records of Accupraisal Management Corporation which are maintained and obtained in the ordinary course of business, and I have personal knowledge of the matters set forth herein because of that review or because of direct personal knowledge. If called upon as a witness in this case, I would and could testify competently thereto.

3.     From my review of the property located at 374 West 8th Street, San Pedro, California (the "Property") and the information that I gathered and reviewed in order to prepare the Appraisals, I believe that the value of the Property is not declining but is at least stable. Further, I concluded for each of the Appraisals that although the future value of subject property is truely unknown, based on the information in the market condition addendums, which are attached to the Appraisals, the market has increased approximately 8% for the last 12 months. I believe the market will continue to increase by approximately that rate.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct and that this Declaration was executed on June 7, 2010 at San Gabriel California.

ROBERT JEFFRIES

## DECLARATION OF JAMES P. COLE

I, JAMES P. COLE, declare as follows:

1.    I make this declaration of my own personal knowledge.  If necessary, I could and would competently testify as to the following.

2.    I am a consultant on construction and general contracting issues with Bel Esprit Builders, Inc., and have regularly given expert testimony on construction and general contracting issues for over twelve years.  A copy of my Curriculum Vitae is attached hereto as **Exhibit 4**.

3.    We have conducted an initial inspection of real property commonly known as 374 West 8th Street, San Pedro, California (the "Subject Property").  The purposes of our inspection were to determine the extent of damage to the Subject Property, if any, resulting from the lack of protection during the period in which the Subject Property had been in the care of Robb Evans and Associates, the appointed Receiver of the Subject Property; and to determine whether further damage or additional damage could negatively affect the value of the Property.

4.    Based upon our initial inspection, I was unable to determine the full extent of the damage as a result of the framing being exposed to the elements without the proper protection for a prolonged period.

5.    The existing OSB wall and floor sheathing appear to require 100% removal and replacement.

6.    Further investigation will be required to determine the extent of the damage to the balance of the framing components, but it does not appear likely from my initial inspection that it will be possible to salvage the framing in its current state.

7.    Many factors will need to be considered regarding the structural stability and the future performance of the structure.

8.    Applying both exterior and interior finishes to a building in the condition of that on the Subject Property is likely to lead to some severe performance problems in the future and could be a warranty problem for any contractor that is willing to complete a project in this condition.

9.    Although our investigation is in the early stages, it is my preliminary estimate,

1  based upon our initial inspection, that the damage to the structure is in the amount of at least

2  $600,000, and may exceed the $1,300,000.00 that I am informed was expended on the

3  construction of the structure to date.

4      10.    It is also my opinion, based upon our initial inspection, that no further damage can

5  be done to the construction by virtue of its unprotected state, so the Property will not sustain

6  additional damages and the value of the Property is not declining.

7      I declare under penalty of perjury under the laws of the United States of America that the

8  above is true and correct and that this Declaration was executed on June 7, 2010 at

9  MURRIETA , California.

11  JAMES P. COLE